The NEW KIDS ON THE BLOCK, a Massachusetts general partnership consisting of Donnie Wahlberg, Danny Wood, Jonathan Knight, Jordan Knight and Joe McIntyre; Dick Scott Entertainment, Inc.; Infotainment, Inc.; Winterland Concessions Co. Inc.; Big Step Productions, Inc., Plaintiffs–Appellants,

v.

NEWS AMERICA PUBLISHING, INC., d/b/a/ Star Magazine; Gannett Satellite Information Network, Inc., d/b/a/ USA Today, Inc., Defendants–Appellees.

The NEW KIDS ON THE BLOCK, a Massachusetts general partnership consisting of Donnie Wahlberg, Danny Wood, Jonathan Knight, Jordan Knight and Joe McIntyre; Dick Scott Entertainment, Inc.; Infotainment, Inc.; Winterland Concessions Co. Inc.; Big Step Productions, Inc., Plaintiffs–Appellants,

v.

GANNETT SATELLITE INFORMATION NETWORK, INC., d/b/a/ USA Today, Inc., Defendant–Appellee.

Nos. 90–56219, 90–56258.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 4, 1991.

Decided July 24, 1992.

**304**

Philip Heller, James L. Warren, Edward P. Davis, Jr., Kevin M. Fong, Judy Alexander, Pillsbury, Madison & Sutro, San Francisco, Cal., for the plaintiffs-appellants.

Rex S. Heinke, Kelli L. Sager, Jeri C. Okamoto, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant-appellee News America Pub., Inc.

Charles P. Diamond, Craig A. Corman, O'Melveny & Myers, Los Angeles, Cal., for defendant-appellee Gannett Satellite Information Network, Inc.

Before SCHROEDER and KOZINSKI, Circuit Judges, and ORRICK, Jr.,* District Judge.

KOZINSKI, Circuit Judge.

The individual plaintiffs perform professionally as The New Kids on the Block, reputedly one of today's hottest musical acts. This case requires us to weigh their rights in that name against the rights of others to use it in identifying the New Kids as the subjects of public opinion polls.

### Background

No longer are entertainers limited to their craft in marketing themselves to the public. This is the age of the multi-media publicity blitzkrieg: Trading on their popularity, many entertainers hawk posters, T-shirts, badges, coffee mugs and the like—handsomely supplementing their incomes while boosting their public images. The New Kids are no exception; the record in this case indicates there are more than 500 products or services bearing the New Kids trademark. Among these are services taking advantage of a recent development in telecommunications: 900 area code numbers, where the caller is charged a fee, a portion of which is paid to the call recipient. Fans can call various New Kids 900 numbers to listen to the New Kids talk about themselves, to listen to other fans talk about the New Kids, or to leave messages for the New Kids and other fans.

The defendants, two newspapers of national circulation, conducted separate polls of their readers seeking an answer to a pressing question: Which one of the New Kids is the most popular? *USA Today*'s announcement contained a picture of the New Kids and asked, "Who's the best on the block?" The announcement listed a 900 number for voting, noted that "any USA Today profits from this phone line will go to charity," and closed with the following:

> New Kids on the Block are pop's hottest group. Which of the five is your fave? Or are they a turn off? ... Each call costs 50 cents. Results in Friday's Life section.

*The Star*'s announcement, under a picture of the New Kids, went to the heart of the matter: "Now which kid is the sexiest?" The announcement, which appeared in the middle of a page containing a story on a New Kids concert, also stated:

> Which of the New Kids on the Block would you most like to move next door? STAR wants to know which cool New Kid is the hottest with our readers.

Readers were directed to a 900 number to register their votes; each call cost 95 cents per minute.[1]

Fearing that the two newspapers were undermining their hegemony over their fans, the New Kids filed a shotgun complaint in federal court raising no fewer than ten claims: (1) common law trademark infringement; (2) Lanham Act false adver-

---

* The Honorable William H. Orrick, Jr., United States District Judge for the Northern District of California, sitting by designation.

1. The *USA Today* poll generated less than $300 in revenues, all of which the newspaper donated to the Berklee College of Music. *The Star*'s poll generated about $1600.

tising; (3) Lanham Act false designation of origin; (4) Lanham Act unfair competition; (5) state trade name infringement; (6) state false advertising; (7) state unfair competition; (8) commercial misappropriation; (9) common-law misappropriation; and (10) intentional interference with prospective economic advantage. The two papers raised the First Amendment as a defense, on the theory that the polls were part and parcel of their "news-gathering activities." The district court granted summary judgment for defendants. 745 F.Supp. 1540 (C.D.Cal. 1990).

### Discussion

■ While the district court granted summary judgment on First Amendment grounds, we are free to affirm on any ground fairly presented by the record. *Jackson v. Southern Cal. Gas Co.*, 881 F.2d 638, 643 (9th Cir.1989); *Pelleport Inv., Inc. v. Budco Quality Theatres, Inc.*, 741 F.2d 273, 278 (9th Cir.1984). Indeed, where we are able to resolve the case on nonconstitutional grounds, we ordinarily must avoid reaching the constitutional issue. *In re Snyder*, 472 U.S. 634, 642–43, 105 S.Ct. 2874, 2879–80, 86 L.Ed.2d 504 (1985); *Schweiker v. Hogan*, 457 U.S. 569, 585, 102 S.Ct. 2597, 2607, 73 L.Ed.2d 227 (1982). Therefore, we consider first whether the New Kids have stated viable claims on their various causes of action.

### I

A. Since at least the middle ages, trademarks have served primarily to identify the source of goods and services, "to facilitate the tracing of 'false' or defective wares and the punishment of the offending craftsman." F. Schechter, *The Historical Foundations of the Law Relating to Trademarks* 47 (1925). The law has protected trademarks since the early seventeenth century, and the primary focus of trade-mark law has been misappropriation—the problem of one producer's placing his rival's mark on his own goods. See, e.g., *Southern v. How*, 79 Eng.Rep. 1243 (K.B. 1618). The law of trademark infringement was imported from England into our legal system with its primary goal the prevention of unfair competition through misappropriated marks. See, e.g., *Taylor v. Carpenter*, 23 F.Cas. 742 (C.C.D.Mass. 1844) (Story, J.). Although an initial attempt at federal regulation was declared unconstitutional, see the *Trade-Mark Cases*, 100 U.S. 82, 25 L.Ed. 550 (1879), trademarks have been covered by a comprehensive federal statutory scheme since the passage of the Lanham Act in 1946.

■ Throughout the development of trademark law, the purpose of trademarks remained constant and limited: Identification of the manufacturer or sponsor of a good or the provider of a service.[2] And the wrong protected against was traditionally equally limited: Preventing producers from free-riding on their rivals' marks. Justice Story outlined the classic scenario a century and a half ago when he described a case of "unmitigated and designed infringement of the rights of the plaintiffs, for the purpose of defrauding the public and taking from the plaintiffs the fair earnings of their skill, labor and enterprise." *Taylor*, 23 F.Cas. at 744. The core protection of the Lanham Act remains faithful to this conception. See 15 U.S.C. § 1114 (prohibiting unauthorized use in commerce of registered marks). Indeed, this area of the law is generally referred to as "unfair competition"—unfair because, by using a rival's mark, the infringer capitalizes on the investment of time, money and resources of his competitor; unfair also because, by doing so, he obtains the consumer's hard-earned dollar through something akin to fraud. See Paul Heald, *Federal Intellectual Property Law and the Economics of*

---

**2.** In economic terms, trademarks reduce consumer search costs by informing people that trademarked products come from the same source.

The benefit of the brand name is analogous to that of designating individuals by last as well as first names, so that, instead of having to say "the Geoffrey who teaches constitutional law at the University of Chicago Law School—not the one who teaches corporations," you can say "Geoffrey Stone, not Geoffrey Miller." William M. Landes and Richard A. Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & Econ. 265, 269 (1987).

*Preemption,* 76 Iowa L.Rev. 959, 1002–03 (1991).

■ A trademark is a limited property right in a particular word, phrase or symbol.[3] And although English is a language rich in imagery, we need not belabor the point that some words, phrases or symbols better convey their intended meanings than others. See *San Francisco Arts & Athletics, Inc. v. U.S.O.C.,* 483 U.S. 522, 569, 107 S.Ct. 2971, 2998, 97 L.Ed.2d 427 (1987) (Brennan, J., dissenting) ("[A] jacket reading 'I Strongly Resent the Draft' would not have conveyed Cohen's message."). Indeed, the primary cost of recognizing property rights in trademarks is the removal of words from (or perhaps non-entrance into) our language. Thus, the holder of a trademark will be denied protection if it is (or becomes) generic, i.e., if it does not relate exclusively to the trademark owner's product. See, e.g., *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) ("shredded wheat"); *Eastern Air Lines, Inc. v. New York Air Lines, Inc.,* 559 F.Supp. 1270 (S.D.N.Y. 1983) ("air-shuttle" to describe hourly plane service). This requirement allays fears that producers will deplete the stock of useful words by asserting exclusive rights in them.[4] When a trademark comes to describe a class of goods rather than an individual product, the courts will hold as a matter of law that use of that mark does not imply sponsorship or endorsement of the product by the original holder.

■ A related problem arises when a trademark also describes a person, a place or an attribute of a product. If the trademark holder were allowed exclusive rights in such use, the language would be depleted in much the same way as if generic words were protectable. Thus trademark law recognizes a defense where the mark is used only "to describe the goods or services of [a] party, or their geographic origin." 15 U.S.C. § 1115(b)(4). "The 'fair-use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1185 (5th Cir.1980). Once again, the courts will hold as a matter of law that the original producer does not sponsor or endorse another product that uses his mark in a descriptive manner. See, e.g., *Schmid Laboratories v. Youngs Drug Products Corp.,* 482 F.Supp. 14 (D.N.J.1979) ("ribbed" condoms).

With many well-known trademarks, such as Jell-O, Scotch tape and Kleenex, there are equally informative non-trademark words describing the products (gelatin, cellophane tape and facial tissue). But sometimes there is no descriptive substitute, and a problem closely related to genericity and descriptiveness is presented when many goods and services are effectively identifiable only by their trademarks. For example, one might refer to "the two-time world champions" or "the professional basketball team from Chicago," but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls. In such cases, use of the trademark does not imply sponsorship or endorsement of the product because the mark is used only to describe the thing, rather than to identify its source.

Indeed, it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark. For example, reference to a large automobile manufacturer based in

---

**3.** Trademark protection, like other legal protections of property rights, guards against the overuse of resources while also providing incentives for the creation of new combinations of resources. See *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.,* 958 F.2d 896, 900 (9th Cir.1992).

**4.** It's far more convenient, for example, to ask your local pharmacist for "aspirin"—once a trademark—than to remember or pronounce "salicylic acid." An interesting question is whether a word, although once generic, may become protectable. For example, the word "Jeep," which originally meant a general purpose military vehicle and, later, any rugged sport-utility vehicle, is now being used as a trademark by Chrysler. Cf. *Crescent Tool Co. v. Kilborn & Bishop Co.,* 247 F. 299 (2d Cir.1917) (protecting plaintiff's use of the trademark "Crescent," which originally described a certain kind of wrench).

Michigan would not differentiate among the Big Three; reference to a large Japanese manufacturer of home electronics would narrow the field to a dozen or more companies. Much useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark.

A good example of this is *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir.1969), where we held that Volkswagen could not prevent an automobile repair shop from using its mark. We recognized that in "advertising [the repair of Volkswagens, it] would be difficult, if not impossible, for [Church] to avoid altogether the use of the word 'Volkswagen' or its abbreviation 'VW,' which are the normal terms which, to the public at large, signify appellant's cars." *Id.* at 352. Church did not suggest to customers that he was part of the Volkswagen organization or that his repair shop was sponsored or authorized by VW; he merely used the words "Volkswagen" and "VW" to convey information about the types of cars he repaired. Therefore, his use of the Volkswagen trademark was not an infringing use.

■ The First Circuit confronted a similar problem when the holder of the trademark "Boston Marathon" tried to stop a television station from using the name:

> [T]he words "Boston Marathon" ... do more than call attention to Channel 5's program; they also *describe* the event that Channel 5 will broadcast. Common sense suggests (consistent with the record here) that a viewer who sees those words flash upon the screen will believe simply that Channel 5 will show, or is showing, or has shown, the marathon, not that Channel 5 has some special approval from the [trademark holder] to do so. In technical trademark jargon, the use of words for descriptive purposes is called a "fair use," and the law usually permits it even if the words themselves also constitute a trademark.

*WCVB–TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46 (1st Cir.1991). Similarly, competitors may use a rival's trademark in advertising and other channels of communication if the use is not false or misleading. See, e.g., *Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir.1968) (maker of imitation perfume may use original's trademark in promoting product).[5]

Cases like these are best understood as involving a non-trademark use of a mark—a use to which the infringement laws simply do not apply, just as videotaping television shows for private home use does not implicate the copyright holder's exclusive right to reproduction. See *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 447–51, 104 S.Ct. 774, 791–93, 78 L.Ed.2d 574 (1984).[6] Indeed, we may generalize a

---

**5.** A trademark may even be used lawfully in a way that many people, including the trademark owner, may find offensive. Consider *Girl Scouts v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228 (S.D.N.Y.1969): Defendants published a poster showing "a smiling girl dressed in the well-known green uniform of the Junior Girl Scouts, with her hands clasped above her protruding, clearly pregnant abdomen. The caveat 'BE PREPARED' appears next to her hands." *Id.* at 1230. The court found no infringement: "[R]ational analysis of the situation does not indicate a likelihood that the public will believe that the Girl Scouts are the authors of the poster to which they understandably take such violent exception." *Id.* at 1231.

**6.** The common law has recognized a fair use defense to claims of copyright infringement involving relatively harmless violations for centuries. See *Gyles v. Wilcox*, 26 Eng.Rep. 489, 490 (Ch. 1740); William F. Patry, *The Fair Use Privi-*

*lege in Copyright Law* 6–17 (1985). While fair use has been part of American copyright law for over a century and a half, see *Folsom v. Marsh*, 9 F.Cas. 342, 344–49 (C.C.D.Mass.1841) (Story, J.), and *Gray v. Russell*, 10 F.Cas. 1035, 1038–39 (C.C.D.Mass.1839) (Story, J.), the doctrine was only codified in the 1976 revision of the copyright laws. Pub.L. No. 94–553, 90 Stat. 2546 (1976); see 17 U.S.C. § 107.

Sound policies underlie the fair use defense. The copyright holder has a property interest in preventing others from reaping the fruits of his labor, not in preventing the authors and thinkers of the future from making use of, or building upon, his advances. The process of creation is often an incremental one, and advances building on past developments are far more common than radical new concepts. See *Lewis Galoob Toys, Inc. v. Nintendo, Inc.*, 964 F.2d 965 (9th Cir.1992). Where the infringement is small in relation to the new work created, the fair user is profiting largely from his own creative

class of cases where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one. Such *nominative use* of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law: Because it does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder. "When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth." *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) (Holmes, J.).

■ To be sure, this is not the classic fair use case where the defendant has used the plaintiff's mark to describe the defendant's *own* product. Here, the New Kids trademark is used to refer to the New Kids themselves. We therefore do not purport to alter the test applicable in the paradigmatic fair use case. If the defendant's use of the plaintiff's trademark refers to something other than the plaintiff's product, the traditional fair use inquiry will continue to govern. But, where the defendant uses a trademark to describe the plaintiff's product, rather than its own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets the following three requirements: First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or

service;[7] and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

■ **B.** The New Kids do not claim there was anything false or misleading about the newspapers' use of their mark. Rather, the first seven causes of action, while purporting to state different claims, all hinge on one key factual allegation: that the newspapers' use of the New Kids name in conducting the unauthorized polls somehow implied that the New Kids were sponsoring the polls.[8] It is no more reasonably possible, however, to refer to the New Kids as an entity than it is to refer to the Chicago Bulls, Volkswagens or the Boston Marathon without using the trademark. Indeed, how could someone not conversant with the proper names of the individual New Kids talk about the group at all? While plaintiffs' trademark certainly deserves protection against copycats and those who falsely claim that the New Kids have endorsed or sponsored them, such protection does not extend to rendering newspaper articles, conversations, polls and comparative advertising impossible. The first nominative use requirement is therefore met.

Also met are the second and third requirements. Both *The Star* and *USA Today* reference the New Kids only to the extent necessary to identify them as the subject of the polls; they do not use the New Kids' distinctive logo or anything else that isn't needed to make the announcements intelligible to readers. Finally, nothing in the announcements suggests joint sponsorship or endorsement by the New Kids. The *USA Today* announcement im-

---

efforts rather than free-riding on another's work. A prohibition on all copying whatsoever would stifle the free flow of ideas without serving any legitimate interest of the copyright holder.

**7.** Thus, a soft drink competitor would be entitled to compare its product to Coca–Cola or Coke, but would not be entitled to use Coca–Cola's distinctive lettering. See *Volkswagenwerk,* 411 F.2d at 352 ("Church did not use Volkswagen's distinctive lettering style or color scheme, nor did he display the encircled 'VW'

emblem"); cf. *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 758 (9th Cir.1978) (taking "more than was necessary" can defeat copyright fair use defense).

**8.** The New Kids effectively concede as much. See Opening Brief at 17 n. 11 ("plaintiffs showed a genuine issue of material fact as to whether defendants' use of the New Kids' name and likeness was likely to cause confusion regarding [the] existence of such an 'implied endorsement'"); Reply Brief at 14 (same).

plies quite the contrary by asking whether the New Kids might be "a turn off." *The Star*'s poll is more effusive but says nothing that expressly or by fair implication connotes endorsement or joint sponsorship on the part of the New Kids.

The New Kids argue that, even if the newspapers are entitled to a nominative fair use defense for the announcements, they are not entitled to it for the polls themselves, which were money-making enterprises separate and apart from the newspapers' reporting businesses. According to plaintiffs, defendants could have minimized the intrusion into their rights by using an 800 number or asking readers to call in on normal telephone lines which would not have resulted in a profit to the newspapers based on the conduct of the polls themselves.

The New Kids see this as a crucial difference, distinguishing this case from *Volkswagenwerk*, *WCBV–TV* and other nominative use cases. The New Kids' argument in support of this distinction is not entirely implausible: They point out that their fans, like everyone else, have limited resources. Thus a dollar spent calling the newspapers' 900 lines to express loyalty to the New Kids may well be a dollar not spent on New Kids products and services, including the New Kids' own 900 numbers. In short, plaintiffs argue that a nominative fair use defense is inapplicable where the use in question competes directly with that of the trademark holder.

■ We reject this argument. While the New Kids have a limited property right in their name, that right does not entitle them to control their fans' use of their own money. Where, as here, the use does not imply sponsorship or endorsement, the fact that it is carried on for profit and in competition with the trademark holder's business is beside the point. See, e.g., *Universal City Studios, Inc. v. Ideal Publishing Corp.*, 195 U.S.P.Q. 761 (S.D.N.Y.1977) (maga-zine's use of TV program's trademark "Hardy Boys" in connection with photographs of show's stars not infringing). Voting for their favorite New Kid may be, as plaintiffs point out, a way for fans to articulate their loyalty to the group, and this may diminish the resources available for products and services they sponsor. But the trademark laws do not give the New Kids the right to channel their fans' enthusiasm (and dollars) only into items licensed or authorized by them. See *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1990) (no infringement where unauthorized jewelry maker produced rings and pins bearing fraternal organization's trademark). The New Kids could not use the trademark laws to prevent the publication of an unauthorized group biography or to censor all parodies or satires which use their name.[9] We fail to see a material difference between these examples and the use here.

Summary judgment was proper as to the first seven causes of action because they all hinge on a theory of implied endorsement; there was none here as the uses in question were purely nominative.

## II

The New Kids raise three additional claims that merit brief attention.

■ A. The New Kids claim that *USA Today*'s and *The Star*'s use of their name amounted to both commercial and common law misappropriation under California law. Although there are subtle differences between these two causes of action, all that's material here is a key similarity between them: The papers have a complete defense to both claims if they used the New Kids name "in connection with any news, public affairs, or sports broadcast or account" which was true in all material respects. See Cal.Civ.Code § 3344(d); *Eastwood v.*

---

**9.** Consider, for example, a cartoon which appeared in a recent edition of a humor magazine: The top panel depicts a man in medieval garb hanging a poster announcing a performance of "The New Kids on the Block" to an excited group of onlookers. The lower panel shows the five New Kids, drawn in caricature, hands tied behind their backs, kneeling before "The Chopping Block" awaiting execution. *Cracked* # 17 (inside back cover) (Aug.1992). Cruel? No doubt—but easily within the realm of satire and parody. See note 5, supra.

**310**

*Superior Ct.,* 149 Cal.App.3d 409, 421 & 426, 198 Cal.Rptr. 342 (1983) (extending the section 3344(d) defense to common law misappropriation claims); see also *Leidholdt v. L.F.P. Inc.,* 860 F.2d 890, 895 (9th Cir. 1988), cert. denied, 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989); *Maheu v. CBS, Inc.,* 201 Cal.App.3d 662, 676–77, 247 Cal.Rptr. 304 (1988).[10]

█ In this case, *USA Today*'s and *The Star*'s use of the New Kids' name was "in connection with" news accounts: *The Star* ran concurrent articles on the New Kids along with its 900–number poll, while *USA Today* promised a subsequent story on the popularity of various members of the singing group. Both papers also have an established track record of polling their readers and then reporting the poll results as part of a later news story. The New Kids' misappropriation claims are barred by California Civil Code section 3344(d).

█ B. The New Kids' remaining claim is for intentional interference with prospective economic advantage, but they ignore the maxim that all's fair in love, war and the free market. Plaintiffs' case rests on the assumption that the polls operated to siphon off the New Kids' fans or divert their resources away from "official" New Kids products. Even were we to accept this premise, no tort claim has been made out: "So long as the plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means.... In short, it is no tort to beat a business rival to prospective customers." *A–Mark Coin Co. v. General Mills, Inc.,* 148 Cal.App.3d 312, 323, 195 Cal.Rptr. 859 (1983); see B. Witkin, 5 *Summary of California Law* § 669 at 766 (1988) ("one competitor may induce customers of the other to do business with him"). Because we have already determined that the newspapers' use of the

mark was "fair and reasonable," the New Kids do not have a tort claim based on the fact that they may have lost some business to a competitor.

Conclusion

The district court's judgment is AFFIRMED.

---

**10.** Contrary to the New Kids' assertion, see 745 F.Supp. at 1546 n. 8, the section 3344(d) defense is not coextensive with the First Amendment. Rather, it is designed to avoid First Amendment questions in the area of misappropriation by

providing extra breathing space for the use of a person's name in connection with matters of public interest. See *Eastwood,* 149 Cal.App.3d at 421, 198 Cal.Rptr. 342.