**Vanna WHITE, Plaintiff–Appellant,**

v.

**SAMSUNG ELECTRONICS AMERICA, INC.; David Deutsch Associates, Defendants–Appellees.**

**No. 90–55840.**

United States Court of Appeals, Ninth Circuit.

March 18, 1993.

Before GOODWIN, PREGERSON and ALARCON, Circuit Judges.

The panel has voted unanimously to deny the petition for rehearing. Circuit Judge Pregerson has voted to reject the suggestion for rehearing en banc, and Circuit Judge Goodwin so recommends. Circuit Judge Alarcon has voted to accept the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

KOZINSKI, Circuit Judge, with whom Circuit Judges O'SCANNLAIN and KLEINFELD join, dissenting from the order rejecting the suggestion for rehearing en banc.

I

Saddam Hussein wants to keep advertisers from using his picture in unflattering contexts.[1] Clint Eastwood doesn't want tabloids to write about him.[2] Rudolf Valentino's heirs want to control his film biography.[3] The Girl Scouts don't want their image soiled by association with certain activities.[4] George Lucas wants to keep Strategic Defense Initiative fans from calling it "Star Wars."[5] Pepsico doesn't want singers to use the word "Pepsi" in their songs.[6] Guy Lombardo wants an exclusive

---

**1.** See Eben Shapiro, *Rising Caution on Using Celebrity Images*, N.Y. Times, Nov. 4, 1992, at D20 (Iraqi diplomat objects on right of publicity grounds to ad containing Hussein's picture and caption "History has shown what happens when one source controls all the information").

**2.** *Eastwood v. Superior Court*, 149 Cal.App.3d 409, 198 Cal.Rptr. 342 (1983).

**3.** *Guglielmi v. Spelling–Goldberg Prods.*, 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454 (1979) (Rudolph Valentino); *see also Maheu v. CBS, Inc.*, 201 Cal.App.3d 662, 668, 247 Cal.Rptr. 304 (1988) (aide to Howard Hughes). *Cf.* Frank Gannon, *Vanna Karenina*, in *Vanna Karenina and Other Reflections* (1988) (A humorous short

story with a tragic ending. "She thought of the first day she had met VR__SKY. How foolish she had been. How could she love a man who wouldn't even tell her all the letters in his name?").

**4.** *Girl Scouts v. Personality Posters Mfg.*, 304 F.Supp. 1228 (S.D.N.Y.1969) (poster of a pregnant girl in a Girl Scout uniform with the caption "Be Prepared").

**5.** *Lucasfilm Ltd. v. High Frontier*, 622 F.Supp. 931 (D.D.C.1985).

**6.** Pepsico Inc. claimed the lyrics and packaging of grunge rocker Tad Doyle's "Jack Pepsi" song were "offensive to [it] and [ . . . ] likely to offend

property right to ads that show big bands playing on New Year's Eve.[7] Uri Geller thinks he should be paid for ads showing psychics bending metal through telekinesis.[8] Paul Prudhomme, that household name, thinks the same about ads featuring corpulent bearded chefs.[9] And scads of copyright holders see purple when their creations are made fun of.[10]

Something very dangerous is going on here. Private property, including intellectual property, is essential to our way of life. It provides an incentive for investment and innovation; it stimulates the flourishing of our culture; it protects the moral entitlements of people to the fruits of their labors. But reducing too much to private property can be bad medicine. Private land, for instance, is far more useful if separated from other private land by public streets, roads and highways. Public parks, utility rights-of-way and sewers reduce the amount of land in private hands, but vastly enhance the value of the property that remains.

So too it is with intellectual property. Overprotecting intellectual property is as harmful as underprotecting it. Creativity is impossible without a rich public domain. Nothing today, likely nothing since we tamed fire, is genuinely new: Culture, like science and technology, grows by accretion, each new creator building on the works of those who came before. Overprotection stifles the very creative forces it's supposed to nurture.[11]

[its] customers," in part because they "associate [Pepsico] and its Pepsi marks with intoxication and drunk driving." Deborah Russell, *Doyle Leaves Pepsi Thirsty for Compensation,* Billboard, June 15, 1991, at 43. Conversely, the Hell's Angels recently sued Marvel Comics to keep it from publishing a comic book called "Hell's Angel," starring a character of the same name. Marvel settled by paying $35,000 to charity and promising never to use the name "Hell's Angel" again in connection with any of its publications. *Marvel, Hell's Angels Settle Trademark Suit,* L.A. Daily J., Feb. 2, 1993, § II, at 1.

Trademarks are often reflected in the mirror of our popular culture. *See* Truman Capote, *Breakfast at Tiffany's* (1958); Kurt Vonnegut, Jr., *Breakfast of Champions* (1973); Tom Wolfe, *The Electric Kool-Aid Acid Test* (1968) (which, incidentally, includes a chapter on the Hell's Angels); Larry Niven, *Man of Steel, Woman of Kleenex,* in *All the Myriad Ways* (1971); *Looking for Mr. Goodbar* (1977); *The Coca-Cola Kid* (1985) (using Coca-Cola as a metaphor for American commercialism); *The Kentucky Fried Movie* (1977); *Harley Davidson and the Marlboro Man* (1991); *The Wonder Years* (ABC 1988–present) ("Wonder Years" was a slogan of Wonder Bread); Tim Rice & Andrew Lloyd Webber, *Joseph and the Amazing Technicolor Dream Coat* (musical).

*Hear* Janis Joplin, *Mercedes Benz,* on *Pearl* (CBS 1971); Paul Simon, *Kodachrome,* on *There Goes Rhymin' Simon* (Warner 1973); Leonard Cohen, *Chelsea Hotel,* on *The Best of Leonard Cohen* (CBS 1975); Bruce Springsteen, *Cadillac Ranch,* on *The River* (CBS 1980); Prince, *Little Red Corvette, on 1999* (Warner 1982); dada, *Dizz Knee Land,* on *Puzzle* (IRS 1992) ("I just robbed a grocery store—I'm going to Disneyland / I just flipped off President George—I'm going to Disneyland"); Monty Python, *Spam,* on *The Final Rip Off* (Virgin 1988); Roy Clark, *Thank God and Greyhound [You're Gone],* on *Roy Clark's Greatest Hits Volume I* (MCA 1979); Mel Tillis, *Coca-Cola Cowboy,* on *The Very Best of* (MCA 1981) ("You're just a Coca-Cola cowboy / You've got an Eastwood smile and Robert Redford hair ...").

*Dance to* Talking Heads, *Popular Favorites 1976–92: Sand in the Vaseline* (Sire 1992); Talking Heads, *Popsicle,* on *id.* Admire Andy Warhol, *Campbell's Soup Can. Cf.* REO Speedwagon, 38 Special, and Jello Biafra of the Dead Kennedys.

The creators of some of these works might have gotten permission from the trademark owners, though it's unlikely Kool-Aid relished being connected with LSD, Hershey with homicidal maniacs, Disney with armed robbers, or Coca-Cola with cultural imperialism. Certainly no free society can *demand* that artists get such permission.

7. *Lombardo v. Doyle, Dane & Bernbach, Inc.,* 58 A.D.2d 620, 396 N.Y.S.2d 661 (1977).

8. *Geller v. Fallon McElligott,* No. 90-Civ-2839 (S.D.N.Y. July 22, 1991) (involving a Timex ad).

9. *Prudhomme v. Procter & Gamble Co.,* 800 F.Supp. 390 (E.D.La.1992).

10. *E.g., Acuff-Rose Music, Inc. v. Campbell,* 972 F.2d 1429 (6th Cir.1992); *Cliffs Notes v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490 (2d Cir.1989); *Fisher v. Dees,* 794 F.2d 432 (9th Cir.1986); *MCA, Inc. v. Wilson,* 677 F.2d 180 (2d Cir.1981); *Elsmere Music, Inc. v. NBC,* 623 F.2d 252 (2d Cir.1980); *Walt Disney Prods. v. The Air Pirates,* 581 F.2d 751 (9th Cir.1978); *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541 (2d Cir.1964); *Lowenfels v. Nathan,* 2 F.Supp. 73 (S.D.N.Y.1932).

11. *See* Wendy J. Gordon, *A Property Right in Self Expression: Equality and Individualism in*

The panel's opinion is a classic case of overprotection. Concerned about what it sees as a wrong done to Vanna White, the panel majority erects a property right of remarkable and dangerous breadth: Under the majority's opinion, it's now a tort for advertisers to *remind* the public of a celebrity. Not to use a celebrity's name, voice, signature or likeness; not to imply the celebrity endorses a product; but simply to evoke the celebrity's image in the public's mind. This *Orwellian notion withdraws far* more from the public domain than prudence and common sense allow. It conflicts with the Copyright Act and the Copyright Clause. It raises serious First Amendment problems. It's bad law, and it deserves a long, hard second look.

## II

Samsung ran an ad campaign promoting its consumer electronics. Each ad depicted a Samsung product and a humorous prediction: One showed a raw steak with the caption "Revealed to be health food. 2010 A.D." Another showed Morton Downey, Jr. in front of an American flag with the caption "Presidential candidate. 2008 A.D." [12] The ads were meant to convey—humorously—that Samsung products would still be in use twenty years from now.

The ad that spawned this litigation starred a robot dressed in a wig, gown and jewelry reminiscent of Vanna White's hair and dress; the robot was posed next to a Wheel-of-Fortune-like game board. *See* Appendix. The caption read "Longest-running game show. 2012 A.D." The gag here, I take it, was that Samsung would still be around when White had been replaced by a robot.

Perhaps failing to see the humor, White sued, alleging Samsung infringed her right of publicity by "appropriating" her "identity." Under California law, White has the exclusive right to use her name, likeness, signature and voice for commercial purposes. Cal.Civ.Code § 3344(a); *Eastwood v. Superior Court*, 149 Cal.App.3d 409, 417, 198 Cal.Rptr. 342, 347 (1983). But Samsung didn't use her name, voice or signature, and it certainly didn't use her likeness. The ad just wouldn't have been funny had it depicted White or someone who resembled her—the whole joke was that the game show host(ess) was a robot, not a real person. No one seeing the ad could have thought this was supposed to be White in 2012.

The district judge quite reasonably held that, because Samsung didn't use White's name, likeness, voice or signature, it didn't violate her right of publicity. 971 F.2d at 1396–97. Not so, says the panel majority: The California right of publicity can't possibly be limited to name and likeness. If it were, the majority reasons, a "clever advertising strategist" could avoid using White's name or likeness but nevertheless remind people of her with impunity, "effectively eviscerat[ing]" her rights. To prevent this "evisceration," the panel majority holds that the right of publicity must extend beyond name and likeness, to any "appropriation" of White's "identity"—anything that "evoke[s]" her personality. *Id.* at 1398–99.

## III

But what does "evisceration" mean in intellectual property law? Intellectual property rights aren't like some constitutional rights, absolute guarantees protected against all kinds of interference, subtle as well as blatant.[13] They cast no penumbras, emit no emanations: The very point of intellectual property laws is that they protect only against certain specific kinds of appropriation. I can't publish unauthorized copies of, say, *Presumed Innocent;* I can't make a movie out of it. But I'm

---

the Natural Law of Intellectual Property, 102 Yale L.J. 1533, 1556–57 (1993).

**12.** I had never heard of Morton Downey, Jr., but I'm told he's sort of like Rush Limbaugh, but not as shy.

**13.** *Cf., e.g., Guinn v. United States*, 238 U.S. 347, 364–65, 35 S.Ct. 926, 931, 59 L.Ed. 1340 (1915) (striking down grandfather clause that was a clear attempt to evade the Fifteenth Amendment).

perfectly free to write a book about an idealistic young prosecutor on trial for a crime he didn't commit.[14] So what if I got the idea from *Presumed Innocent?* So what if it reminds readers of the original? Have I "eviscerated" Scott Turow's intellectual property rights? Certainly not. All creators draw in part on the work of those who came before, referring to it, building on it, poking fun at it; we call this creativity, not piracy.[15]

The majority isn't, in fact, preventing the "evisceration" of Vanna White's existing rights; it's creating a new and much broader property right, a right unknown in California law.[16] It's replacing the existing balance between the interests of the celebrity and those of the public by a different balance, one substantially more favorable to the celebrity. Instead of having an exclusive right in her name, likeness, signature or voice, every famous person now has an exclusive right to *anything that reminds the viewer of her.* After all, that's

all Samsung did: It used an inanimate object to remind people of White, to "evoke [her identity]." 971 F.2d at 1399.[17]

Consider how sweeping this new right is. What is it about the ad that makes people think of White? It's not the robot's wig, clothes or jewelry; there must be ten million blond women (many of them quasi-famous) who wear dresses and jewelry like White's. It's that the robot is posed near the "Wheel of Fortune" game board. Remove the game board from the ad, and no one would think of Vanna White. *See* Appendix. But once you include the game board, anybody standing beside it—a brunette woman, a man wearing women's clothes, a monkey in a wig and gown—would evoke White's image, precisely the way the robot did. It's the "Wheel of Fortune" set, not the robot's face or dress or jewelry that evokes White's image. The panel is giving White an exclusive right not in what she looks like or who she is, but in what she does for a living.[18]

---

14. It would be called "Burden of Going Forward with the Evidence," and the hero would ultimately be saved by his lawyer's adept use of Fed.R.Evid. 301.

15. In the words of Sir Isaac Newton, "[i]f I have seen further it is by standing on [the shoulders] of Giants." Letter to Robert Hooke, Feb. 5, 1675/1676.

   Newton himself may have borrowed this phrase from Bernard of Chartres, who said something similar in the early twelfth century. Bernard in turn may have snatched it from Priscian, a sixth century grammarian. *See Lotus Dev. Corp. v. Paperback Software Int'l,* 740 F.Supp. 37, 77 n. 3 (D.Mass.1990).

16. In fact, in the one California case raising the issue, the three state Supreme Court Justices who discussed this theory expressed serious doubts about it. *Guglielmi v. Spelling–Goldberg Prods.,* 25 Cal.3d 860, 864 n. 5, 160 Cal.Rptr. 352, 355 n. 5, 603 P.2d 454, 457 n. 5 (1979) (Bird, C.J., concurring) (expressing skepticism about finding a property right to a celebrity's "personality" because it is "difficult to discern any easily applied definition for this amorphous term").

   Neither have we previously interpreted California law to cover pure "identity." *Midler v. Ford Motor Co.,* 849 F.2d 460 (9th Cir.1988), and *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093 (9th Cir. 1992), dealt with appropriation of a celebrity's voice. *See id.* at 1100–01 (imitation of singing style, rather than voice, doesn't violate the right of publicity).

*Motschenbacher v. R.J. Reynolds Tobacco Co.,* 498 F.2d 821 (9th Cir.1974), stressed that, though the plaintiff's likeness wasn't directly recognizable by itself, the surrounding circumstances would have made viewers think the likeness was the plaintiff's. *Id.* at 827; *see also Moore v. Regents of the Univ. of Cal.,* 51 Cal.3d 120, 138, 271 Cal.Rptr. 146, 157, 793 P.2d 479, 490 (1990) (construing *Motschenbacher* as "hold[ing] that every person has a proprietary interest in his own likeness").

17. Some viewers might have inferred White was endorsing the product, but that's a different story. The right of publicity isn't aimed at or limited to false endorsements, *Eastwood v. Superior Court,* 149 Cal.App.3d 409, 419–20, 198 Cal.Rptr. 342, 348 (1983); that's what the Lanham Act is for.

   Note also that the majority's rule applies even to advertisements that unintentionally remind people of someone. California law is crystal clear that the common-law right of publicity may be violated even by unintentional appropriations. *Id.* at 417 n. 6, 198 Cal.Rptr. at 346 n. 6; *Fairfield v. American Photocopy Equipment Co.,* 138 Cal.App.2d 82, 87, 291 P.2d 194 (1955).

18. Once the right of publicity is extended beyond specific physical characteristics, this will become a recurring problem: Outside name, likeness and voice, the things that most reliably remind the public of celebrities are the actions or roles they're famous for. A commercial with an astronaut setting foot on the moon would

This is entirely the wrong place to strike the balance. Intellectual property rights aren't free: They're imposed at the expense of future creators and of the public at large. Where would we be if Charles Lindbergh had an exclusive right in the concept of a heroic solo aviator? If Arthur Conan Doyle had gotten a copyright in the idea of the detective story, or Albert Einstein had patented the theory of relativity? If every author and celebrity had been given the right to keep people from mocking them or their work? Surely this would have made the world poorer, not richer, culturally as well as economically.[19]

This is why intellectual property law is full of careful balances between what's set aside for the owner and what's left in the public domain for the rest of us: The relatively short life of patents; the longer, but finite, life of copyrights; copyright's idea-expression dichotomy; the fair use doctrine; the prohibition on copyrighting facts; the compulsory license of television broadcasts and musical compositions; federal preemption of overbroad state intellectual property laws; the nominative use doctrine

in trademark law; the right to make soundalike recordings.[20] All of these diminish an intellectual property owner's rights. . All let the public use something. created by someone else. But all are necessary to maintain a free environment in which creative genius can flourish.

The intellectual property right created by the panel here has none of these essential limitations: No fair use exception; no right to parody; no idea-expression dichotomy. It impoverishes the public domain, to the detriment of future creators and the public at large. Instead of well-defined, limited characteristics such as name, likeness or voice, advertisers will now have to cope with vague claims of "appropriation of identity," claims often made by people with a wholly exaggerated sense of their own fame and significance. *See* pp. 1512–13 & notes 1–10 *supra*. Future Vanna Whites might not get the chance to create their personae, because their employers may fear some celebrity will claim the persona is too similar to her own.[21] The public will be robbed of parodies of celebrities, and

---

evoke the image of Neil Armstrong. Any masked man on horseback would remind people (over a certain age) of Clayton Moore. And any number of songs—"My Way," "Yellow Submarine," "Like a Virgin," "Beat It," "Michael, Row the Boat Ashore," to name only a few—instantly evoke an image of the person or group who made them famous, regardless of who is singing.

  *See also* Carlos V. Lozano, *West Loses Lawsuit over Batman TV Commercial*, L.A. Times, Jan. 18, 1990, at B3 (Adam West sues over Batman-like character in commercial); *Nurmi v. Peterson*, 10 U.S.P.Q.2d 1775, 1989 WL 407484 (C.D.Cal.1989) (1950s TV movie hostess "Vampira" sues 1980s TV hostess "Elvira"); text accompanying notes 7–8 (lawsuits brought by Guy Lombardo, claiming big bands playing at New Year's Eve parties remind people of him, and by Uri Geller, claiming psychics who can bend metal remind people of him). *Cf. Motschenbacher*, where the claim was that viewers would think plaintiff was actually in the commercial, and not merely that the commercial reminded people of him.

**19.** *See generally* Gordon, *supra* note 11; *see also* Michael Madow, *Private Ownership of Public Image: Popular Culture and Publicity Rights*, 81 Cal.L.Rev. 125, 201–03 (1993) (an excellent discussion).

**20.** *See* 35 U.S.C. § 154 (duration of patent); 17 U.S.C. §§ 302–305 (duration of copyright); 17

U.S.C. § 102(b) (idea-expression dichotomy); 17 U.S.C. § 107 (fair use); *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, —— U.S. ——, ——, 111 S.Ct. 1282, 1288, 113 L.Ed.2d 358 (1991) (no copyrighting facts); 17 U.S.C. §§ 115, 119(b) (compulsory licenses); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (federal preemption); *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 306–308 (9th Cir.1992) (nominative use); 17 U.S.C. § 114(b) (soundalikes); *accord G.S. Rasmussen & Assocs. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 900 n. 7 (9th Cir.1992); Daniel A. Saunders, Comment, *Copyright Law's Broken Rear Window*, 80 Cal.L.Rev. 179, 204–05 (1992). *But see Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir.1988).

**21.** If Christian Slater, star of "Heathers," "Pump up the Volume," "Kuffs," and "Untamed Heart"—and alleged Jack Nicholson clone—appears in a commercial, can Nicholson sue? Of 54 stories on LEXIS that talk about Christian Slater, 26 talk about Slater's alleged similarities to Nicholson. Apparently it's his nasal wisecracks and killer smiles, St. Petersburg Times, Jan. 10, 1992, at 13, his eyebrows, Ottawa Citizen, Jan. 10, 1992, at E2, his sneers, Boston Globe, July 26, 1991, at 37, his menacing presence, USA Today, June 26, 1991, at 1D, and his sing-song voice, Gannett News Service, Aug. 27, 1990 (or, some say, his insinuating drawl, L.A. Times, Aug. 22, 1990, at F5). That's a whole lot more than White and the robot had in common.

our culture will be deprived of the valuable safety valve that parody and mockery create.

Moreover, consider the moral dimension, about which the panel majority seems to have gotten so exercised. Saying Samsung "appropriated" something of White's begs the question: *Should* White have the exclusive right to something as broad and amorphous as her "identity"? Samsung's ad didn't simply copy White's schtick—like all parody, it created something new.[22] True, Samsung did it to make money, but White does whatever she does to make money, too; the majority talks of "the difference between fun and profit," 971 F.2d at 1401, but in the entertainment industry fun *is* profit. Why is Vanna White's right to exclusive for-profit use of her persona—a persona that might not even be her own creation, but that of a writer, director or producer—superior to Samsung's right to profit by creating its own inventions? Why should she have such absolute rights to control the conduct of others, unlimited by the idea-expression dichotomy or by the fair use doctrine?

To paraphrase only slightly *Feist Publications, Inc. v. Rural Telephone Service Co.,* — U.S. —, — – —, 111 S.Ct. 1282, 1289–90, 113 L.Ed.2d 358 (1991), it may seem unfair that much of the fruit of a creator's labor may be used by others without compensation. But this is not some unforeseen byproduct of our intellectual property system; it is the system's very essence. Intellectual property law assures authors the right to their original expression, but encourages others to build freely on the ideas that underlie it. This result is neither unfair nor unfortunate: It is the means by which intellectual property law advances the progress of science and art. We give authors certain exclusive rights, but in exchange we get a richer public domain. The majority ignores this wise teaching, and all of us are the poorer for it.[23]

## IV

The panel, however, does more than misinterpret California law: By refusing to recognize a parody exception to the right of publicity, the panel directly contradicts the federal Copyright Act. Samsung didn't merely parody Vanna White. It parodied Vanna White appearing in "Wheel of Fortune," a copyrighted television show, and parodies of copyrighted works are governed by federal copyright law.

Copyright law specifically gives the world at large the right to make "fair use" parodies, parodies that don't borrow too much of the original. *Fisher v. Dees,* 794 F.2d 432, 435 (9th Cir.1986). Federal copyright law also gives the copyright owner the exclusive right to create (or license the creation of) derivative works, which include parodies that borrow too much to qualify as "fair use." *See Acuff–Rose Music, Inc. v. Campbell,* 972 F.2d 1429, 1434–35 (6th Cir.1992).[24] When Mel Brooks, for instance, decided to parody *Star Wars,* he

22. *Cf. New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 307 n. 6 (9th Cir.1992) ("Where the infringement is small in relation to the new work created, the fair user is profiting largely from his own creative efforts rather than free-riding on another's work.").

23. The majority opinion has already earned some well-deserved criticisms on this score. Stephen R. Barnett, *In Hollywood's Wheel of Fortune, Free Speech Loses a Turn,* Wall St. J., Sept. 28, 1992, at A14; Stephen R. Barnett, *Wheel of Misfortune for Advertisers: Ninth Circuit Misreads the Law to Protect Vanna White's Image,* L.A. Daily J., Oct. 5, 1992, at 6; Felix H. Kent, *California Court Expands Celebrities' Rights,* N.Y.L.J., Oct. 30, 1992, at 3 ("To speak of the 'evisceration' of such a questionable common law right in a case that has probably gone the farthest of any case in any court in the United States of America is more than difficult to comprehend"); Shapiro, *supra* note 1 ("A fat chef? A blond robot in an evening gown? How far will this go?" (citing Douglas J. Wood, an advertising lawyer)). *See also* Mark Alan Stamaty, *Washingtoon,* Wash. Post, Apr. 5, 1993, at A21.

24. How much is too much is a hotly contested question, but one thing is clear: The right to make parodies belongs either to the public at large or to the copyright holder, not to someone who happens to appear in the copyrighted work.

had two options: He could have stuck with his fair use rights under 17 U.S.C. § 107, or he could have gotten a license to make a derivative work under 17 U.S.C. § 106(b) from the holder of the *Star Wars* copyright. To be safe, he probably did the latter, but once he did, he was guaranteed a perfect right to make his movie.[25]

The majority's decision decimates this federal scheme. It's impossible to parody a movie or a TV show without at the same time "evok[ing]" the "identit[ies]" of the actors.[26] You can't have a mock *Star Wars* without a mock Luke Skywalker, Han Solo and Princess Leia, which in turn means a mock Mark Hamill, Harrison Ford and Carrie Fisher. You can't have a mock *Batman* commercial without a mock Batman, which means someone emulating the mannerisms of Adam West or Michael Keaton. *See* Carlos V. Lozano, *West Loses Lawsuit over Batman TV Commercial*, L.A. Times, Jan. 18, 1990, at B3 (describing Adam West's right of publicity lawsuit over a commercial produced under license from DC Comics, owner of the Batman copyright).[27] The public's right to make a fair use parody and the copyright owner's right to license a derivative work are useless if the parodist is held hostage by every actor whose "identity" he might need to "appropriate."

Our court is in a unique position here. State courts are unlikely to be particularly sensitive to federal preemption, which, after all, is a matter of first concern to the federal courts. The Supreme Court is unlikely to consider the issue because the right of publicity seems so much a matter of state law. That leaves us. It's our responsibility to keep the right of publicity from taking away federally granted rights, either from the public at large or from a copyright owner. We must make sure state law doesn't give the Vanna Whites and Adam Wests of the world a veto over fair use parodies of the shows in which they appear, or over copyright holders' exclusive right to license derivative works of those shows. In a case where the copyright owner isn't even a party—where no one has the interests of copyright owners at heart—the majority creates a rule that greatly diminishes the rights of copyright holders in this circuit.

## V

The majority's decision also conflicts with the federal copyright system in another, more insidious way. Under the dormant Copyright Clause, state intellectual property laws can stand only so long as they don't "prejudice the interests of other States." *Goldstein v. California*, 412 U.S. 546, 558, 93 S.Ct. 2303, 2310, 37 L.Ed.2d 163 (1973). A state law criminalizing record piracy, for instance, is permissible because citizens of other states would "remain free to copy within their borders those works which may be protected elsewhere." *Id.* But the right of publicity isn't geographically limited. A right of publicity created by one state applies to conduct everywhere, so long as it involves a celebrity domiciled in that state. If a Wyoming resident creates an ad that features a California domiciliary's name or likeness, he'll be subject to California right of publicity law even if he's careful to keep the ad from being shown in California. *See Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir.1983); *Groucho Marx Prods. v. Day and Night Co.*, 689 F.2d 317, 320 (2d Cir.1982); *see*

---

**25.** *See Spaceballs* (1987). *Compare Madonna: Truth or Dare* (1991) *with Medusa: Dare to Be Truthful* (1991); *Loaded Weapon I* (1993) *with Lethal Weapon* (1987); *Young Frankenstein* (1974) *with Bride of Frankenstein* (1935).

**26.** 17 U.S.C. § 301(b)(1) limits the Copyright Act's preemptive sweep to subject matter "fixed in any tangible medium of expression," but White's identity—her look as the hostess of Wheel of Fortune—is definitely fixed: It consists entirely of her appearances in a fixed, copyrighted TV show. *See Baltimore Orioles v.*

*Major League Baseball Players Ass'n*, 805 F.2d 663, 675 & n. 22 (7th Cir.1986).

**27.** *Cf. Lugosi v. Universal Pictures*, 25 Cal.3d 813, 827–28, 160 Cal.Rptr. 323, 331–32, 603 P.2d 425, 433–34 (1979) (Mosk, J., concurring) (pointing out that rights in characters should be owned by the copyright holder, not the actor who happens to play them); *Baltimore Orioles*, 805 F.2d at 674–79 (baseball players' right of publicity preempted by copyright law as to telecasts of games).

*also Factors Etc. v. Pro Arts*, 652 F.2d 278, 281 (2d Cir.1981).

The broader and more ill-defined one state's right of publicity, the more it interferes with the legitimate interests of other states. A limited right that applies to unauthorized use of name and likeness probably does not run afoul of the Copyright Clause, but the majority's protection of "identity" is quite another story. Under the majority's approach, any time anybody in the United States—even somebody who lives in a state with a very narrow right of publicity—creates an ad, he takes the risk that it might remind some segment of the public of somebody, perhaps somebody with only a local reputation, somebody the advertiser has never heard of. *See* note 17 *supra* (right of publicity is infringed by unintentional appropriations). So you made a commercial in Florida and one of the characters reminds Reno residents of their favorite local TV anchor (a California domiciliary)? Pay up.

This is an intolerable result, as it gives each state far too much control over artists in other states. No California statute, no California court has actually tried to reach this far. It is ironic that it is we who plant this kudzu in the fertile soil of our federal system.

## VI

Finally, I can't see how giving White the power to keep others from evoking her image in the public's mind can be squared with the First Amendment. Where does White get this right to control our thoughts? The majority's creation goes way beyond the protection given a trademark or a copyrighted work, or a person's name or likeness. All those things control one particular way of expressing an idea, one way of referring to an object or a person. But not allowing *any* means of reminding people of someone? That's a speech restriction unparalleled in First Amendment law.[28]

What's more, I doubt even a name-and-likeness-only right of publicity can stand without a parody exception. The First Amendment isn't just about religion or politics—it's also about protecting the free development of our national culture. Parody, humor, irreverence are all vital components of the marketplace of ideas. The last thing we need, the last thing the First Amendment will tolerate, is a law that lets public figures keep people from mocking them, or from "evok[ing]" their images in the mind of the public. 971 F.2d at 1399.[29]

The majority dismisses the First Amendment issue out of hand because Samsung's ad was commercial speech. *Id.* at 1401 & n. 3. So what? Commercial speech may be less protected by the First Amendment than noncommercial speech, but less protected means protected nonetheless. *Cen-*

---

**28.** Just compare the majority's holding to the intellectual property laws upheld by the Supreme Court. The Copyright Act is constitutional precisely because of the fair use doctrine and the idea-expression dichotomy, *Harper & Row v. Nation Enterprises,* 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985), two features conspicuously absent from the majority's doctrine. The right of publicity at issue in *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 576, 97 S.Ct. 2849, 2857–58, 53 L.Ed.2d 965 (1977), was only the right to "broadcast of petitioner's entire performance," not "the unauthorized use of another's name for purposes of trade." *Id.* Even the statute upheld in *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 530, 107 S.Ct. 2971, 2977, 97 L.Ed.2d 427 (1987), which gave the USOC sweeping rights to the word "Olympic," didn't purport to protect all expression that reminded people of the Olympics.

**29.** The majority's failure to recognize a parody exception to the right of publicity would apply equally to parodies of politicians as of actresses. Consider the case of Wok Fast, a Los Angeles Chinese food delivery service, which put up a billboard with a picture of then-L.A. Police Chief Daryl Gates and the text "When you can't leave the office. Or won't." (This was an allusion to Chief Gates's refusal to retire despite pressure from Mayor Tom Bradley.) Gates forced the restaurant to take the billboard down by threatening a right of publicity lawsuit. Leslie Berger, *He Did Leave the Office—And Now Sign Will Go, Too,* L.A. Times, July 31, 1992, at B2.

*See also Samsung Has Seen the Future: Brace Yourself,* Adweek, Oct. 3, 1988, at 26 (ER 72) (Samsung planned another ad that would show a dollar bill with Richard Nixon's face on it and the caption "Dollar bill. 2025 A.D.," but Nixon refused permission to use his likeness); Madow,

*tral Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). And there are very good reasons for this. Commercial speech has a profound effect on our culture and our attitudes. Neutral-seeming ads influence people's social and political attitudes, and themselves arouse political controversy.[30] "Where's the Beef?" turned from an advertising catchphrase into the only really memorable thing about the 1984 presidential campaign.[31] Four years later, Michael Dukakis called George Bush "the Joe Isuzu of American politics."[32]

In our pop culture, where salesmanship must be entertaining and entertainment must sell, the line between the commercial and noncommercial has not merely blurred; it has disappeared. Is the Samsung parody any different from a parody on Saturday Night Live or in Spy Magazine? Both are equally profit-motivated. Both use a celebrity's identity to sell things—one to sell VCRs, the other to sell advertising. Both mock their subjects. Both try to make people laugh. Both add something, perhaps something worthwhile and memorable, perhaps not, to our culture. Both are things that the people being portrayed might dearly want to suppress. *See* notes 1 & 29 *supra.*

Commercial speech is a significant, valuable part of our national discourse. The Supreme Court has recognized as much, and has insisted that lower courts carefully scrutinize commercial speech restrictions, but the panel totally fails to do this. The panel majority doesn't even purport to apply the *Central Hudson* test, which the Supreme Court devised specifically for determining whether a commercial speech restriction is valid.[33] The majority doesn't ask, as *Central Hudson* requires, whether the speech restriction is justified by a substantial state interest. It doesn't ask whether the restriction directly advances the interest. It doesn't ask whether the restriction is narrowly tailored to the interest. *See id.* at 566, 100 S.Ct. at 2351.[34] These are all things the Supreme Court told us—in no uncertain terms—we must consider; the majority opinion doesn't even mention them.[35]

Process matters. The Supreme Court didn't set out the *Central Hudson* test for its health. It devised the test because it saw lower courts were giving the First Amendment short shrift when confronted with commercial speech. *See Central Hudson,* 447 U.S. at 561–62, 567–68, 100 S.Ct. at 2348–49, 2352. The *Central Hudson* test was an attempt to constrain lower courts' discretion, to focus judges' thinking

*supra* note 19, at 142–46 (discussing other politically and culturally charged parodies).

**30.** *See, e.g.,* Bruce Horovitz, *Nike Does It Again; Firm Targets Blacks with a Spin on "Family Values",* L.A. Times, Aug. 25, 1992, at D1 ("The ad reinforces a stereotype about black fathers" (quoting Lawrence A. Johnson of Howard University)); Gaylord Fields, *Advertising Awards–Show Mania: CEBA Awards Honors Black–Oriented Advertising,* Back Stage, Nov. 17, 1989, at 1 (quoting the Rev. Jesse Jackson as emphasizing the importance of positive black images in advertising); Debra Kaufman, *Quality of Hispanic Production Rising to Meet Clients' Demands,* Back Stage, July 14, 1989, at 1 (Hispanic advertising professional stresses importance of positive Hispanic images in advertising); Marilyn Elias, *Medical Ads Often Are Sexist,* USA Today, May 18, 1989, at 1D ("There's lots of evidence that this kind of ad reinforces stereotypes" (quoting Julie Edell of Duke University)).

**31.** *See Wendy's Kind of Commercial; "Where's the Beef" Becomes National Craze,* Broadcasting, Mar. 26, 1984, at 57.

**32.** *See* Gregory Gordon, *Candidates Look for Feedback Today,* UPI, Sept. 26, 1988.

**33.** Its only citation to *Central Hudson* is a seeming afterthought, buried in a footnote, and standing only for the proposition that commercial speech is less protected under the First Amendment. *See* 971 F.2d at 1401 n. 3.

**34.** *See also Board of Trustees v. Fox,* 492 U.S. 469, 476–81, 109 S.Ct. 3028, 3032–35, 106 L.Ed.2d 388 (1989) (reaffirming "narrowly tailored" requirement, but making clear it's not a "least restrictive means" test).

The government has a freer hand in regulating false or misleading commercial speech, but this isn't such a regulation. Some "appropriations" of a person's "identity" might misleadingly suggest an endorsement, but the mere possibility that speech might mislead isn't enough to strip it of First Amendment protection. *See Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 644, 105 S.Ct. 2265, 2278, 85 L.Ed.2d 652 (1985).

**35.** Neither does it discuss whether the speech restriction is unconstitutionally vague. *Posadas de P.R. Assocs. v. Tourism Co.,* 478 U.S. 328, 347, 106 S.Ct. 2968, 2980, 92 L.Ed.2d 266 (1986).

on the important issues—how strong the state interest is, how broad the regulation is, whether a narrower regulation would work just as well. If the Court wanted to leave these matters to judges' gut feelings, to nifty lines about "the difference between fun and profit," 971 F.2d at 1401, it could have done so with much less effort.

Maybe applying the test would have convinced the majority to change its mind; maybe going through the factors would have shown that its rule was too broad, or the reasons for protecting White's "identity" too tenuous. Maybe not. But we shouldn't thumb our nose at the Supreme Court by just refusing to apply its test.

## VII

For better or worse, we *are* the Court of Appeals for the Hollywood Circuit. Millions of people toil in the shadow of the law we make, and much of their livelihood is made possible by the existence of intellectual property rights. But much of their livelihood—and much of the vibrancy of our culture—also depends on the existence of other intangible rights: The right to draw ideas from a rich and varied public domain, and the right to mock, for profit as well as fun, the cultural icons of our time.

In the name of avoiding the "evisceration" of a celebrity's rights in her image, the majority diminishes the rights of copyright holders and the public at large. In the name of fostering creativity, the majority suppresses it. Vanna White and those like her have been given something they never had before, and they've been given it at our expense. I cannot agree.

# Appendix