WHAM–O, INC., Plaintiff,

v.

PARAMOUNT PICTURES CORPORA-TION and Happy Madison Productions, Inc., Defendants.

No. C–03–4071 MHP.

United States District Court, N.D. California.

Sept. 30, 2003.

Annette L. Hurst, Simon J. Frankel, Jeffrey T. Norberg, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, A Professional Corporation, Davis Wright Tremaine LLP, San Francisco, CA, for Plaintiff.

Thomas R. Burke, Davis Wright Tremaine LLP, San Francisco, CA, Catherine E. Maxson, Davis Wright Tremaine LLP, Seattle, WA, Scott Martin, Associate General Counsel, Paramount Pictures Corporation, Hollywood, CA, for Defendant.

## *MEMORANDUM AND ORDER* Motion for Temporary Restraining Order

PATEL, Chief Judge.

On September 8, 2003, WHAM–O, Inc. ("plaintiff") filed a complaint against Paramount Production Corporation and Happy Madison Productions (collectively "defendants"), focusing on defendants' use of a particular WHAM–O product in the film "Dickie Roberts: Former Child Star"

("the film"). Plaintiff's complaint states three claims for relief: one, a claim for infringement of a registered trademark in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); two, a claim for unfair competition in violation of section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a); and, three, a claim for dilution of a registered trademark in violation of section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). On September 12, 2003, plaintiff filed an *ex parte* motion for a temporary restraining order ("TRO") and / or an order to show cause ("OSC"), pursuant to Federal Rule of Civil Procedure 65(b), regarding a preliminary injunction.

On September 18, the court conducted a hearing on plaintiff's TRO motion. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

*BACKGROUND* [1]

I. *The History of the Slide*

Since 1948, plaintiff has manufactured and marketed a line of toys. *See* Sgromo Decl. ¶ 2. Known for producing the "Hacky Sack" footbag, the "Frisbee" throwing disc, the "Hula Hoop," and the "Superball" rubber ball, plaintiff has developed a substantial niche in the toy market. *Id.* at ¶¶ 3 & 8. Since the mid–1980s, plaintiffs have also manufactured and marketed the "Slip 'N Slide Yellow" water-slide toy ("the slide"), a toy constructed of little more than an elongated patch of flexible and inflatable plastic. *Id.* at ¶ 5.

The slide is not a new toy. Introduced in 1961 and registered with the United States Patent and Trademark Office ("PTO") in 1963 by Kransco, *id.* at ¶¶ 6–8, the slide has been promoted and sold throughout the country for decades. *Id.;* *see also id.* at ¶ 7 (noting that the YELLOW water-slide mark was registered with the PTO in 1987). As initially de-

signed, the slide raised product liability concerns and eventually spurred product liability litigation. *See Kransco International Ins. Co. v. Empire Surplus Lines Insurance Company*, 23 Cal.4th 390, 394–95, 97 Cal.Rptr.2d 151, 2 P.3d 1 (2000) (discussing the injuries sustained and damages recovered by an former user of the slide). As a result, for an unspecified period of time, the slide disappeared from the toy market. *Id.* at ¶ 8.

After acquiring the "Slip 'N Slide" and "YELLOW" marks—with their attendant good will—from Kransco, *id.* at ¶¶ 6–8, plaintiff set about reintroducing the slide to the toy market. *Id.* at ¶ 9. To this end, plaintiff redesigned the toy, adding, *inter alia,* a "blue scalloped bumper" to one end of slide to act as a soft stop for sliding users. *Id.* The Consumer Products Safety Commission sanctioned this redesign, approving of plaintiff's efforts to insert the modified slide into the toy market. *Id.*

In May of 1998, plaintiffs began distributing the slide to retailers. Within six months, plaintiffs appended a pair of disclaimers on each slide unit, instructing potential users of two use-limits: one, that the slide was intended for use by children between the ages of five and twelve; and, two, that the slide was not intended for use by any person taller than five feet and heavier than 110 pounds. *Id.* at ¶ 11. To use a slide properly, one must fill the plastic sheet with water and air and, in turn, wet the outside of the sheet. *Id.* Directions for inflation and lubrication of the slide were also provided with each slide unit. *Id.*

Plaintiff partnered its reintroduction of the new slide with an aggressive marketing and promotional campaign. *Id.* at ¶ 12. Using television advertisements, retail promotions, and a variety of other marketing

---

**1.** This recitation of the facts is culled largely from the parties' moving papers.

tools, plaintiff succeeded in restoring the slide's prominence in the toy market: In the past five years, more than a million slides—priced at approximately ten dollars—have sold. *Id.* Industry rankings place the slide among the most frequently purchased and widely recognized toy items. *Id.* at ¶ 13.

## II. *The Film, the Scene, and the Promotion*

Released on September 5, 2003, the film features David Spade playing an entertainment has-been, a former child star looking to reclaim the acting glory of his past. To do so, Spade's character—Dickie Roberts—must recast his image; he must, the story goes, become a more typical person. *See* Martin Decl. ¶¶ 3–4. For Roberts, this is no easy task. Having spent his childhood in the entertainment spotlight, Roberts lacks the foundation of a putatively standard childhood experience. *Id.* To fill this void, Roberts hires a family to adopt him, hoping the family will be able to provide the experience of a normal child. *Id.*

Pivotal to Roberts' efforts to reclaim his childhood are the two preteen children of Roberts' adoptive family. *See* Norberg Decl. ¶¶ 1–3. To teach Roberts the ways of a normal child, the two decide, they must expose Roberts to "real kid"-like activities. *See* Martin Decl. ¶ 4. One of these activities is playing on the slide. *Id.*

The scene in which Roberts and his two adoptive siblings play on the slide lasts approximately 70 seconds. *Id.* Set in the backyard of the adoptive family's home, the scene opens with an image of a long yellow plastic sheet spread across a grassy patch. Far removed from the typical experience set of a child, Roberts needs a prefatory explanation of what the slide is and how it works. His adoptive siblings are ready to oblige: "O.K., Stranger Danger," the brother calls to Roberts; "this is

a Slip 'N Slide." "If you master this," the sister assures, "it's the first step to being a real kid." Eager to become that proverbial "real kid," Roberts runs immediately toward the slide, plainly intending to launch himself across the slide—and, metaphorically, into normal childhood.

But the slide is neither properly inflated nor adequately lubricated. Knowing that Roberts should not be using a dry or airless slide, Roberts' adoptive sister attempts to forestall the impending problem with a warning call: "Dickie!," the sister shouts; "there has to be water on it!" The warning comes too late. Roberts has already launched himself toward the slide, jumping head-first and chest-down along the plastic mat. Roberts skids—with accompanying sound effects—to a quick and painful stop. As he does so, Roberts' adoptive brother notes that Roberts' efforts are "going to leave a mark." They do: Roberts rolls over to reveal a large red abrasion on his chest. "Oooh," Roberts comments; "it stings."

Determined to experience the slide, Roberts opts to try again. This time, to facilitate sliding, Roberts' adoptive sister wets the surface of the slide with a garden hose. The slide is never inflated. When the sister finishes lubricating the mat, Roberts relaunches himself across the slide, this time sliding to the end of the sheet and minimally over-sliding the sheet's end.

Though he has now slid to the end of the sheet, Roberts remains unsatisfied with his slide experience. Hatching "an idea," Roberts coats the slide with a layer of cooking oil, doing so even after his adoptive sister asks if "this is a good idea." With the slide coated in oil, Roberts again slides head-first and chest-down across the mat. Unlike his second attempt, Roberts' third slide does not stop near the end of the mat, however. On this third attempt,

in fact, Roberts slides well off the end of the mat, careening across the lawn at an exaggerated speed, ultimately colliding with a picket fence. Sitting up, Roberts removes a splinter from his hand and declares the slide "Insane in the Membrane." There the scene ends.

In the film's advertisement and promotional campaigns, the slide scene plays a prominent role. It appears in the film's publicly-released trailers; it appears in related promotional materials; it appears in the film's television advertisements; it appears on the film's internet website; and it dominates—or, better put, gives life to—an interactive game named "Dickie Slide" on the film's website. *See* Hurst Decl. ¶¶ 11–12 & Exh. 1; *see also* Martin Decl. ¶¶ 7, 13, & 15 (noting that the theatrical trailers played on no fewer than 21,517 screens and that the slide scene was particularly useful because it captured in seconds Roberts' desires and concomitant ineptitude). "Dickie Slide" asks players to steer an animated character through a course of domestic-life obstacles (e.g., dogs, grills, fences). To win, players must navigate the character to the end of the slide without sustaining too much injury. *Id.* An inset screen charts the player's injury level.

### A. *The Litigation*

As a matter of custom, defendants do not seek the permission of manufacturers of name-brand products to use those products in its films. Defendants thus did not seek plaintiff's permission to use the slide in the film, nor did it solicit permission to use other trademarked products visible in the feature, e.g., Wesson Oil, Volkswagen, and Ford. *See* Martin Decl. ¶ 8. Defen-

dants did solicit the permission of Mad Magazine and E! True Hollywood Story to use copyrighted materials owned by those entities, but at no point did it seek permission to use plaintiff's trademark.

Troubled by plaintiff's use of the slide in the film and in the film's promotional efforts, plaintiffs contacted Paramount's associate general counsel on September 4, the day before the film was released (widely) in theaters. *See* Sgromo Decl. ¶ 17 (claiming that plaintiff did not learn of defendant's use until the week of September 1).[2] Among other things, plaintiff asked defendants to insert a disclaimer regarding the slide's trademark and the slide's proper use. In a letter dated September 8, 2003, defendant disclaimed any liability and refused plaintiff's request to affix a disclaimer to film-related uses of the slide. *See* Hurst Decl. at Exh. D.

On the same day, plaintiff filed a complaint against defendants in this court. Articulating three claims for relief, plaintiff allege infringement of a registered trademark in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), unfair competition in violation of section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a), and dilution of a registered trademark in violation of section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). On September 12, 2003, plaintiff filed an *ex parte* motion for a TRO and / or an OSC, pursuant to Federal Rule of Civil Procedure 65(b), regarding a preliminary injunction. The court conducted a hearing on plaintiff's TRO motion on September 18, 2003.

---

**2.** Defendants saturated the entertainment market with film-related promotions as early as May 2003: the film's website launched on July 10, *see* Martin Decl. ¶ 15; scenes (including the relevant one) were viewable on the internet as early as July 12, *id.;* and theatrical trailers began running on May 30. *Id.* at ¶ 13; *see also* ¶ 14 (noting, too, that television ads began on August 6).

*LEGAL STANDARD*

Like other types of preliminary injunctions, a temporary restraining order may be issued if the plaintiff has established: (1) a likelihood of success on the merits and the possibility of immediate irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips heavily in its favor. *See Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 639 (9th Cir.1993); *see also Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914, 917 (9th Cir.2003) (en banc; per curiam) (citations omitted). The two components of this test sit on a kind of sliding scale or "continuum," *Southwest Voter*, 344 F.3d at 917; thus, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Id.* at 917–18 (articulating the latest standard of review of a district court's preliminary injunction decision to be "limited and deferential"); *see Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir.1985) (citation omitted) (noting that the two prongs "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases").[3] Under any articulation of the relevant test, to justify the grant of injunctive relief, a plaintiff must show a "significant threat of irreparable injury, irrespective of the magnitude of the injury." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1397 n. 1 (9th Cir.) (quoting *Big Country Foods, Inc. v. Board of Educ.*, 868 F.2d 1085, 1088 (9th Cir.1989)), *cert. dismissed*, 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997). The test for preliminary injunctions in the trademark context is similar to that in other civil proceedings. *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir.1988).

Preliminary injunctions are to be issued sparingly. *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (citation omitted; emphasis removed). Where a party seeks mandatory preliminary relief, courts must be "extremely cautious about issuing a preliminary injunction." *Martin v. International Olympic Comm.*, 740 F.2d 670, 675 (9th Cir.1984).

*DISCUSSION*

To determine if plaintiff's claims support the grant of injunctive relief, the court must determine whether plaintiff has adequately shown a likelihood of success on the merits of its claims or that there are serious questions going to the merits of the action. If the court so finds, then it must consider whether plaintiff has demonstrated that it will suffer irreparable injury or that the balance of hardships tips

---

**3.** This two-part test's phrasing—viz., "either . . . or"—implies that the test is a disjunctive one, i.e., that the moving party need only show "either" a combination of probable success and irreparable injury "or" the existence of serious questions tipping sharply in his / her favor to merit equitable relief. *Id.; see F.D.I.C. v. Garner*, 125 F.3d 1272, 1277 (9th Cir.1997). As the Ninth Circuit has reminded, however, the two prongs of this test are more interrelated than disconnected; they represent two poles of a sliding scale along which the "required degree of irreparable harm increases as the probability of success decreases." *America West Airlines, Inc. v. National Mediation Bd.*, 119 F.3d 772, 777 (9th Cir.1997) (implying the converse as well); *see also Big Country Foods*, 868 F.2d at 1088 (noting that the moving party must "demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury") (internal citations omitted).

heavily in its favor. The court addresses each side of this sliding scale below.

## I. *Likelihood of Success on the Merits or Serious Questions Going to the Merits*

### A. *Trademark Dilution*

Federal law protects against the dilution of an established trademark. *See* 15 U.S.C. § 1125(c)(1). Understood as "the gradual 'whittling way' of a trademark's value," *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991) (citation omitted), and as "the lessening of the capacity of a famous mark to identify and distinguish goods and services, regardless of the presence or absence of competition ... or likelihood of confusion, mistake, or deception," 15 U.S.C. § 1127, dilution does not focus on consumer confusion. *See Moseley v. V. Secret Catalogue,* 537 U.S. 418, 123 S.Ct. 1115, 1124, 155 L.Ed.2d 1 (2003); *Playboy Enter., Inc. v. Welles,* 279 F.3d 796, 805 (9th Cir.2002). Rather, "[d]ilution works its harm ... by creating an association in consumers' minds between a mark and a different good or service." *Id.* (citation omitted); *see I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 50 (1st Cir.1998) (describing dilution as reaching "an entirely different issue," viz., "protection from an appropriation of or free riding on the investment [the trademark holder] has made in its [trademark]").

To assess tarnishment and blurring claims, the Ninth Circuit has adopted a four-part test, asking whether (1) the mark is famous; (2) defendant puts the mark to commercial use in commerce; (3) defendant puts the mark to use after the plaintiff's mark became famous; and (4) there exists a likelihood of dilution of the distinc-

tive value of the mark. *See Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 873–874 (9th Cir.1999).[4] On this fourth prong, courts have recognized two types of trademark dilution: blurring and tarnishment. Blurring occurs where another's use of a mark creates "the possibility that the mark will lose its ability to serve as a unique identifier of the [mark holder's] product." *Panavision Int'l. L.P. v. Toeppen,* 141 F.3d 1316, 1326 n. 7 (9th Cir.1998). Tarnishment, by contrast, occurs where a "famous mark is improperly associated with an inferior or offensive product or service." *Id.* Plaintiff alleges that defendants' use of the relevant marks both blurs and tarnishes plaintiff's trademarks.

To begin, there is no doubt that defendants use plaintiff's mark: As defendants readily concede, the name of the product— viz., "Slip 'N Slide"—is spoken in the film, and the image of the yellow slide appears throughout defendants' film-promotion materials. Thus, plaintiff readily satisfies the threshold trademark dilution inquiry, viz., that defendants used plaintiff's marks.

In a like vein, the court assumes that plaintiff may well satisfy the first three prongs of the four-part dilution test: First, plaintiff's marks may well be famous. *See* 15 U.S.C. § 1125(c)(1) (setting forth eight non-exclusive factors to consider in the "famousness" analysis); *see Avery Dennison,* 189 F.3d at 876 (noting "the overlap between the statutory famousness considerations and the factors relevant to establishing acquired distinctiveness); *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349 (9th Cir.1979); *Lexington Mgmt. Corp. v. Lexington Capital Partners,* 10 F.Supp.2d 271 (S.D.N.Y.1998); *Nabisco, Inc. v. PF Brands, Inc.,* 50 F.Supp.2d 188 (S.D.N.Y.

**4.** Were courts to extend dilution protection to trademarks "based only on a showing of inherent or acquired distinctiveness," the Ninth Circuit has explained, courts "would upset the balance [of trademark law] in favor of over-protecting trademarks, at the expense of potential non-infringing uses." *Avery Dennison,* 189 F.3d at 873.

1999), *aff'd*, 191 F.3d 208 (2d Cir.1999). Second, defendant's use of the mark may well have occurred after plaintiff's mark acquired its level of fame. *Id.* And, third, defendants may well have put the marks to commercial use in commerce. *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir.2002) (noting that this statutory language is "ungainly"); *Panavision*, 141 F.3d at 1325; *Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, 261 F.Supp.2d 502, 517 (E.D.Va.2003) (labeling "commercial use" "virtually synonymous" with advertising and the like); *cf. Avery Dennison*, 189 F.3d at 880 ("Appellants do not use trademarks *qua* trademarks as required by the caselaw to establish commercial use. Rather, Appellants use words that happen to be trademarks for their non-trademark value.").

But plaintiff does not satisfy the pivotal fourth prong of the four part dilution test; that is, defendants' use of plaintiff's marks does not plainly constitute dilution—of the tarnishment or the blurring type.

### 1. *Tarnishment*

■ Tarnishment occurs "when a defendant's use of a mark similar to a plaintiff's presents a danger that consumers will form unfavorable associations with the mark." *Avery Dennison*, 189 F.3d at 881. Plaintiff claims that defendants' misuse of the slide in the film, in the film's trailers, in the related television and internet advertising, and in the film's other promotional material tarnishes the plaintiff's marks. Because the toy is misused in the film and the promotional materials, plaintiff stresses, consumers will perceive plaintiff's marks in a negative light.

The court does not doubt that the slide is misused in the film. An unintended user (viz., a too-old, too-heavy slider) puts the slide to obvious—and noted—misuse, a kind of supposedly comedic misuse that prompts real, if humorous, injury. Nor does the court doubt that defendants' depiction of the slide makes it seem an odd sort of toy. But defendants' depiction of the slide does not tarnish plaintiff's marks. Silly as defendants' depiction of the slide may be, the depiction does not inspire a "degree of probable loss of the capability of the mark to serve as a distinctive identifier." *See* McCarthy, McCarthy on Trademarks, § 24:95 (4th ed.). And absurd as defendants' depiction may be, it does not implicate "use of a mark similar to [ ] plaintiff's [that] presents a danger that consumers will form unfavorable associations with the mark." *Avery Dennison*, 189 F.3d at 881. To those knowledgeable about such toys, the "Slip 'N Slide" mark will be no less distinctive as a mark. *Id.* And to those viewing the film, the *mis*use will be apparent and plaintiff's marks will not be harmed. The film presents a hamfisted and exaggerated illustration of slide misuse. It is an obvious and unmistakable misuse, one recognizable by even the youngest or most credulous film viewer, and one expressly described as a misuse in the film itself. Plaintiff's tarnishment claim is unavailing; it is thus not likely that plaintiff's will succeed on a tarnishment-based trademark dilution claim.

### 2. *Blurring*

■ The same is true of plaintiff's blurring claim. As the Ninth Circuit has explained, "[b]lurring occurs when another's use of a mark creates the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Welles*, 279 F.3d at 805 (citation and internal quotation marks omitted). Plaintiff contends that defendants' use of the slide—particularly in the "Dickie Slide" internet game—will engender an unfavorable association in viewers' minds between the slide and the film. This association, plaintiff continues, will blur the unique and

distinctive significance of the relevant marks.

As a threshold matter, the court finds plaintiff's blurring argument antithetical to the crux of its overall theory of liability. Plaintiff's complaint makes clear that its true fear is *not* that consumers will fail to associate the slide with Wham–O but, instead, that consumers will associate the slide with Wham–O too much—particularly because the film makes the slide look somehow dangerous. This fear of over-attribution does not give rise to a tenable blurring claim. *See Welles,* 279 F.3d at 805.[5] It forms, rather, a lament that marks have been highlighted when a particular product is obviously misused, i.e., that defendants have portrayed the slide calumniously.

It is true that defendants misuse the slide in the film. But the kind of misuse to which defendants put the slide does not make plaintiff's marks less unique or identifiable. Plaintiff has not demonstrated anything to confirm actual dilution. Like its tarnishment claim, plaintiff's blurring claim is not likely to succeed on the merits.

### B. *Trademark Infringement and Unfair Competition*

■ Just as federal law protects against the dilution of a trademark, federal law protects against infringement of a regis-tered trademark. *See* 15 U.S.C. §§ 1114, 1125. Unlike the trademark dilution context, however, the focus of a trademark infringement action is consumer confusion. *See Jardine,* 318 F.3d at 908 ("The 'core element' of trademark infringement law is 'whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product.") (citation omitted). To prove that a party has infringed a trademark, a plaintiff must show "that the defendant is using a mark confusingly similar to a valid, protectable trademark of the plaintiff's." *Avery Dennison,* 189 F.3d at 873 (citation omitted); 15 U.S.C. § 1114. Plaintiff fails to make this requisite showing of "confusingly similar" use of the mark in this instance. There is nothing in the record to suggest that defendants' use of plaintiff's marks "creates a likelihood that the consuming public will be confused as to who makes what product." *See Jardine,* 318 F.3d at 908. Consumers and viewers will not mistake plaintiff for a movie production house, and consumers and viewers will not mistake defendants for a purveyor of toys.[6] The court finds that defendants' use of the slide will not spur any likelihood of confusion.[7] And the court finds that plaintiff is not likely to succeed on the merits of its trademark

---

5. In this sense, plaintiff attempts to have it both ways: On the one hand, plaintiff presents the slide as so recognizable that defendants are diluting the value of the mark (and product) by portraying it as a dangerous, if humorous, toy; on the other hand, plaintiff presents the slide as so insufficiently recognized and so poorly labeled in the film that consumers will misperceive the slide's origins.

6. Indeed, the core of plaintiff's complaint confirms this conclusion: The slide is so uniquely and identifiably the product of Wham–O, plaintiff alleges, that audience members will immediately associate the slide with Wham–O, attaching to the slide all the negative portions of defendants' depiction.

7. The Ninth Circuit has held that, "[i]n cases in which the defendant raises a nominative use defense, the [three-part test set forth in *New Kids On The Block v. News America Publishing, Inc.,* 971 F.2d 302 (9th Cir.1992),] should be applied instead of the test for likelihood of confusion set forth in *Sleekcraft.*" *Welles,* 279 F.3d at 801. Because defendants do raise a nominative use defense, the court need not address *Sleekcraft*'s test. It is worth noting, however, that the *Sleekcraft* factors do not combine to support plaintiff's infringement claim.

infringement claim or its related unfair competition claim.

## C. Nominative Use

■ Were the court not convinced that plaintiff's dilution, infringement, and unfair competition claims are unlikely to succeed, the court would still find plaintiff's claims are unlikely to succeed on the merits. This is so, in short, because defendants' use of plaintiff's marks is nominative use, a kind of use excepted from the reach of the FTDA. *See Welles,* 279 F.3d at 806 (holding that nominative use "does not create an improper association in consumers' minds between a new product and the trademark holder's mark").

Nominative use is the use of a mark to identify or to refer to the mark-holder's product. *See generally Cairns v. Franklin Mint Co.,* 292 F.3d 1139, 1150–51 (9th Cir.2002) (reiterating the distinction between nominative and classic fair use defenses). To assess whether a particular use of a mark is nominative, the Ninth Circuit has adopted a three-part test:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and

third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*See Welles,* 279 F.3d at 801 (noting that a "nominative use may also be a commercial use") (citing *New Kids On The Block v. News America Publ'g, Inc.,* 971 F.2d 302, 308 (9th Cir.1992)).

Defendants' use of plaintiff's marks satisfies all three aspects of this nominative use test. First, defendants use plaintiff's mark to identify a product not otherwise readily identifiable. Other verbal formulas (e.g., "water slide" or "lubricated plastic sheet") do not capture or identify the toy with adequate specificity, and trademark law does not compel individuals to "use absurd turns of phrase" simply to avoid trademark liability. *See Welles,* 279 F.3d at 804–05. In the film, defendants intend to identify the slide as a specific product; to do so requires the use of the product's name.[8]

Second, defendants use "only so much of the ... marks ... as is reasonably necessary to identify the product or service." *Id.* (citation omitted).[9] To identify the slide as a toy, it was at once sensible and necessary to refer to the slide by its popular name. A single character does so two times in the film. No depiction of plain-

8. Second, As the Ninth Circuit has observed, "when a trademark also describes a person, a place or an attribute of a product" and no descriptive substitute for the trademark exists. *Welles,* 279 F.3d at 805 (citing *New Kids,* 971 F.2d at 306). When a mark is descriptive, the Ninth Circuit has observed, "allowing the trademark holder exclusive rights would allow the language to 'be depleted in much the same way as if generic words were protectable.'" *Welles,* 279 F.3d at 802 (discussing the example of using the "Chicago Bulls") (citation omitted). And when a mark is descriptive, nominative use of the trademark would "not imply sponsorship or endorsement of the product because the mark is used only to describe the thing, rather than to identify its source." *Id.*

9. As an example of unreasonable and unnecessary use, the Ninth Circuit noted, "a soft drink competitor would be entitled to compare its product to Coca–Cola or Coke, but would not be entitled to use Coca–Cola's distinctive lettering." *Id.* Likewise, an auto shop would be permitted to use the trademarked term "Volkswagen" on a sign denoting the cars it repaired, so long as the shop "did not use Volkswagen's distinctive lettering style or color scheme, nor did [it] display the encircled 'VW' emblem." *Id.* (citing *Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350 (9th Cir.1969)).

tiff's logos or marks appears otherwise, and defendants do not reference plaintiff's marks unnecessarily or abusively. Defendants' use does not exceed that which was "reasonably necessary." *Id.*

And, third, defendants' use does "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Id.; see Brother Records, Inc. v. Jardine,* 318 F.3d 900, 908 (9th Cir.2003). The actual word mark (viz., "Slip 'N Slide") is used but twice, and it is not used or displayed more prominently than any other term. *Id.* Like any other portion of the film's dialogue or set, plaintiff's mark forms part of the film's jumble of imagery; it is not highlighted so as to exploit the value of plaintiff's mark.

As any moviegoer can attest, it is not unusual for movie producers to use a signature scene—and the products and props therein—to cultivate interest in a film. Films with car chases do so with cars; films with gunplay do so with firearms; films with *haute couture* wardrobes do so with clothing. Nothing in the record suggests defendants' used plaintiff's marks to imply that plaintiff placed its imprimatur on the film; nowhere in defendants' publicity efforts is plaintiff's mark unreasonably displayed or abused. *Cf. id.* (finding improper a defendant's use of another's mark as if it was defendant's own). Defendants, instead, use the marks and product in a specific and unique descriptive sense: to evoke associations with an iconic child's toy.

Taken together, the three facets of the relevant test suggest that defendants' use of plaintiff's marks was nominative. The three facets of the nominative use test also show plaintiff's trademark-based claims unlikely to succeed on the merits. *See Metro Publishing, Ltd.,* 987 F.2d at 639 (discussing the standard for a preliminary injunction).

## II. *Preliminary Injunction: Irreparable Injury or Balance of the Hardships*

 As is well established, a temporary restraining order may be issued if the court finds that plaintiff has established: (1) a likelihood of success on the merits and the possibility of immediate irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips heavily in its favor. *See Metro Publishing, Ltd.,* 987 F.2d at 639. The court has found that plaintiff is unlikely to succeed on the merits of its three claims: There is no obvious trademark dilution; there is no plain trademark infringement; and there is no manifest unfair competition. As a threshold matter, then, injunctive relief is not indicated.

Because plaintiff has not established a likelihood of success on the merits, moreover, plaintiff is not entitled to a presumption of irreparable injury. *Cf. GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1209 (9th Cir.2000). In fact, plaintiff does not make the requisite showing of irreparable injury in any way. Nor does the plaintiff demonstrate that there exist serious questions going to the merits, or that the balance of hardships tips heavily in plaintiff's favor. On the former, plaintiff's claims raise no serious question about the propriety of defendants' uses of the relevant marks. On the latter, the hardship balance tips in favor of defendants, not plaintiff: The injunctive relief plaintiff seeks would disrupt defendants' film-related efforts, both financially and physically. More than preserving the status quo, adoption of plaintiff's injunctive relief plan would require thoroughgoing alteration of defendants' promotional campaign and substantial reformatting of the film and the displays in theaters where it is shown. The court finds that plaintiff's plan would generate more hardship than it alleviates.

Injunctive relief is not warranted in this action.

*CONCLUSION*

The court DENIES plaintiff's motion for a temporary restraining order.

IT IS SO ORDERED.